UNITED STATES COURT OF APPEALS
ELEVENTH CIRCUIT

—————————————

NO. 19-15155-AA

—————————————

UNITED STATES OF AMERICA,

      Appellee,

vs.

JONATHAN HIPPS,

      Appellant.

—————————————

**APPELLANT'S INITIAL BRIEF**

—————————————

Appeal from the United States District Court
for the Middle District of Florida

—————————————

WILLIAM R. PONALL
PONALL LAW
SunTrust Building
253 North Orlando Avenue, Suite 201
Maitland, Florida 32751
Florida Bar No. 421634
Telephone: (407) 622-1144
bponall@PonallLaw.com

**UNITED STATES OF AMERICA v. JONATHAN HIPPS**

**CASE NO. 19-15155-AA**

**<u>CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT</u>**

Jackson Boggs, Assistant United States Attorney

Thomas Feiter, Attorney for Defendant in District Court

Todd Grandy, Assistant United States Attorney

Jonathan Hipps, Appellant

Honorable Gregory Presnell, United States District Court Judge, Middle District of Florida

James Smith, Attorney for Defendant in District Court

## **TABLE OF CONTENTS**

PAGE(S)

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . v

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

STATEMENT OF THE CASE AND FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

THE DISTRICT COURT COMMITTED PLAIN ERROR BY
PERMITTING THE GOVERNMENT TO REPEATEDLY
INTRODUCE IMPROPER EVIDENCE, ASK IMPROPER
QUESTIONS, AND MAKE IMPROPER ARGUMENT

    1.    The Prosecutor Asked Questions and Made Arguments
        Which Impermissibly Shifted the Burden of Proof to the
        Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    2.    The Prosecutor Repeatedly Commented on the Defendant
        Exercising His Right to Remain Silent . . . . . . . . . . . . . . . . . . . . 26

    3.    The Prosecutor Improperly Elicited Testimony from Agent
        Shores Regarding His Personal Opinion of the Defendant's
        Credibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    4.    The Government Improperly Introduced Evidence of
        Uncharged Criminal Acts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    5.    The Defendant's Conviction Should Be Reversed . . . . . . . . . . . . 32

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

## TABLE OF AUTHORITIES

**CASES**                                                             **PAGE(S)**

*Minnesota v. Murphy*, 465 U.S. 420 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Seibert v. Florida*, 923 So. 2d 460 (Fla. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Alexander*, 713 Fed. Appx. 919 (11th Cir. 2017) . . . . . . . . . . . 27

*United States v. Belt*, 2509 Fed. Appx. 957 (11th Cir. 2007) . . . . . . . . . . . . . . . 28

*United States v. Campbell*, 223 F.3d 1286 (11th Cir. 2000) . . . . . . . . . . . . . . . . 27

*United States v. Foster*, 760 Fed. Appx 693 (11th Cir. 2019) . . . . . . . . . . . . . . . 33

*United States v. Lail*, 846 F.2d 1299 (11th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Lopez*, 590 F.3d 1238 (11th Cir. 2009) . . . . . . . . . . . . . . . . . . . . 35

*United States v. New*, 491 F.3d 369 (8th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Rivera*, 944 F.2d 1563 (11th Cir. 1991) . . . . . . . . . . . . . . . . . . . 27

*United States v. Schmitz*, 634 F.3d 1247 (11th Cir. 2011) . . . . . . . . . . . . . . . . 28,33

*United States v. Simon*, 964 F.2d 1082 (11th Cir. 1992) . . . . . . . . . . . . . . . . . 22,23

*United States v. Wilchcombe*, 838 F.3d 1179 (11th Cir. 2016) . . . . . . . . . . . . . . 27

## JURISDICTIONAL STATEMENT

This is an appeal from a final criminal judgment of the United States District Court for the Middle District of Florida.  The district court entered judgment against Jonathan Hipps on December 10, 2019.

Mr. Hipps filed a timely notice of appeal on December 24, 2019. *See* Fed. R. App. P. 4(b). This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT REGARDING ORAL ARGUMENT

Mr. Hipps requests oral argument in this case because oral argument will assist the Court in properly addressing the various issues of law and fact raised in this appeal.

## ISSUE PRESENTED

Whether the district court committed plain error by repeatedly permitting the Government to (1) shift the burden of proof to the Defendant; (2) comment on the Defendant exercising his right to remain silent; (3) offer testimony of a law enforcement officer regarding his personal opinion of the defendant's credibility; and (4) present evidence regarding uncharged criminal acts.

## STATEMENT OF THE CASE AND FACTS

Jonathan Hipps was charged by Indictment with Mail Fraud (Count One), Concealment of a Material Fact (Count Two), and Making a False Statement or Representation (Count Three). The charged offenses were all based on actions Mr. Hipps allegedly took as an employee of STAT Industry, Inc. ("STAT"), in July of 2014. Mr. Hipps only worked at STAT from April 2013 through September 2014. (Appendix 1).

The Government alleged that, while he was a STAT employee, Mr. Hipps was responsible for handling a STAT contract with NASA. The contract required STAT to provided NASA with stainless steel threaded rods. Pursuant to the contract, all materials STAT provide to NASA had to comply with the Buy American Act, which requires that only domestic materials be used in the manufacture of an end product under a government contract.  (Appendix 1)

The Government alleged that Mr. Hipps knew that the materials STAT was obligated to provide NASA had to be manufactured in the United States. Despite that fact, the Government alleged that Mr. Hipps fulfilled NASA's order for the stainless steel threaded rods with materials that were manufactured in India. The Government alleged that Mr. Hipps fulfilled the order with knowledge that the materials sent to NASA had been manufactured in India. (Appendix 1).

1

This case proceeded to trial on August 27, 2019. During his opening statement, Mr. Hipps asserted that the evidence would show that it was the president and owner of STAT, Deborah Raney, not Mr. Hipps, who was responsible for fulfilling the contract with NASA with materials from India. He asserted that STAT, not Jonathan Hipps, won the bid from NASA, and that Raney signed the certificate of conformity certifying that the threaded rods complied with the requirements of the contract. Those requirements included that the materials provided to NASA had to be manufactured in the United States. (Appendix 61 at 103-104, 106).

STAT was a middleman that did not actually build anything. STAT bids on government contracts and hires people to fulfill those contacts. (Appendix 61 at 104).

Mr. Hipps advised the jury that he was a low-level employee at STAT. On the dates in question, he was 28 or 29 years old. He started out making $10 an hour. He had no supervisory responsibility. Deborah Raney assigned the NASA contract to him and he started working on it despite the fact that he had no experience in government contracting. (Appendix 61 at 105, 109). Mr. Hipps is a brilliant engineer, but has a hard time with the basic tasks of life because he is on the autism spectrum. (Appendix 61 at 107-109).

Mr. Hipps advised the jury that the evidence would show that, as part of his work on the NASA contract, Mr. Hipps got in touch with CBOL, a company in

California. That company indicated that they could provide the threaded rods STAT was obligated to provide to NASA. Hipps advised Steve Yun, his contact at CBOL, that the parts they needed to provide to NASA had to be made in the United States. (Appendix 61 at 105). Hipps turned down Yun's offer to get STAT the threaded rods at a cheaper price if they were obtained from a company outside the United States. (Appendix 61 at 110).

Mr. Hipps asserted that, for reasons unknown to him, Deborah Raney actually obtained parts from CBOL that were manufactured in India. Raney was feeling pressure to fill the order for NASA and insisted on being present when the threaded rods were received at STAT. Upon their arrival, Raney inspected them, ordered Mr. Hipps to remove the labels attached from them, took the paperwork into another room outside the presence of Hipps, and then ordered Hipps to get them shipped out right away. All this occurred during a period of time when STAT was failing as a business. (Appendix 61 at 105-107, 110).

Mr. Hipps asserted that Raney was a poor manager, that she ruled the company by using tactics of intimidation and threats of termination. He advised the jury that Raney got the threaded rods from India, and when she got caught, used Hipps as a fall guy. (Appendix 61 at 107). He advised the jury that he did not know that the threaded rods were manufactured in India. (Appendix 61 at 110).

3

At trial, the Government presented the testimony of Helena Wilkas, a contracting officer for NASA, David Cerrato, a worker on the receiving dock at the Kennedy Space Center, Agent William Shores, an investigator for the NASA Office of the Inspector General at the Kennedy Space Center, and Agent Thomas DiVita, another investigator for the NASA Office of the Inspector General.

During Helena Wilkas' testimony, the Government introduced the contract between NASA and STAT into evidence. (Appendix 61 at 119). Wilkas testified that the contract specified that the stainless steel threaded rods were required to be manufactured in the United States. (Appendix 61 at 120-121).

Agent Shores testified that he began an investigation into STAT when Helena Wilkas raised concerns about STAT being late in delivering items on their contracts with NASA. At the beginning of his investigation, he was not focused on the threaded rods. Instead, he was looking into stainless steel tubes provided by STAT because a document had been discovered indicating that they may have originated in China. (Appendix 61 at 135-136).

Agent Shores testified that he interviewed Mr. Hipps on three separate occasions. (Appendix 61 at 136). Agent Shores stated that he got Hipps' name from Helana Wilkas and that the first interview occurred over the phone.  During that interview, Agent Shores learned Hipps was employed with STAT from April 2013

4

through September 2014, as a technical specialist. Hipps confirmed that he had worked on the NASA contracts Shores was investigating. (Appendix 61 at 136-137).

Agent Shores also testified that Hipps told him that he had been communicating with CBOL, a California corporation, and had advised them that the products they needed had to be manufactured in the United States. Shores also stated that he asked Hipps if he was aware of any other materials or shipments from STAT industry to NASA that contained substandard parts or equipment, and Hipps responded no, he was not aware of any. (Appendix 61 at 138).

Agent Shores testified that he had a second interview with Mr. Hipps on May 20, 2015. This interview was in-person at the Broward County Library. (Appendix 61 at 139-141).

During this second interview, Shores stated that he was still not focused on the threaded rods, but was still investigating the stainless steel tubes. Hipps identified STAT email addresses that had been assigned to him and that he used during his time as an employee with STAT. Hipps advised Shores that he had specifically advised Steve Yun with CBOL that any materials CBOL provided had to be of domestic origin. Agent Shores testified that Mr. Hipps did not mention anything about the shipment of threaded rods during the second interview. (Appendix 61 at 141-142).

After the second interview, Agent Shores obtained email communications

between Mr. Hipps and Steve Yun. In those communications, Hipps rejected Yun's offer to get tubes from China at a cheaper cost. Hipps explicitly advised him that all the materials provided to STAT needed to originate from the United States. (Appendix 61 at 148-150).

Agent Shores also obtained the STAT file folders related to the contract between NASA and STAT for the threaded rods. He also recovered an email which included the certificate of conformance provided to NASA by STAT, and labels that were removed from the threaded robs prior to them being shipped to NASA. Those labels provided an item description and indicated that they were manufactured in India. (Appendix 61 at 154-159).

Agent Shores testified that he had a third interview with Mr. Hipps on November 2, 2016. This interview was also in person at the Broward County Library. Agent Thomas DiVita was also present at the interview. (Appendix 61 at 160-161).

Agent Shores testified that he did not record any of the three interviews he did with Mr. Hipps. He claimed he would have recorded the third interview if he could do it over again. He stated that he did not record it because he grabbed the wrong file folder that did not have his recorder in it. Agent Shores acknowledged it was normal practice to record interviews of suspects and people who may be subject to criminal liability. (Appendix 61 at 162-163).

Agent Shores testified that Mr. Hipps appeared nervous when he showed him emails regarding the shipment of the threaded rods to NASA and an email containing the certificate of conformance. When Agent Shores showed Hipps documents indicating that the threaded rods had originated in India, Hipps indicated that he had never seen them. (Appendix 61 at 164-165).

Agent Shores testified that Mr. Hipps gasped when he showed him the STAT file folders he had recovered. Hipps confirmed that he recognized the folders and that he was responsible for creating and maintaining them. Hipps also stated that Deborah Raney would put materials in the folders. When Agent Shores showed Hipps documents and labels indicating that items had originated in India, Hipps repeatedly denied ever seeing them. (Appendix 61 at 166-168).

Agent Shores testified that, when he advised Hipps that he did not believe him, Hipps slumped back in his chair, dropped his head, and stated that Deborah Raney just told him to get the stuff shipped. Agent Shores also testified that Hipps said Raney advised him to cut the labels off the threaded rods to make it look like they were made in the United States. (Appendix 61 at 169).

On cross-examination, Agent Shores again testified that he made a mistake by not recording Mr. Hipps' third interview. He again stated that he grabbed the wrong legal pad that did not have his recorder in it. He could not explain why he did not use

his iPhone to record the interview. (Appendix 61 at 200).  Agent Shores confirmed

that he recorded and transcribed all three interviews he did with Deobrah Raney, and

all the interviews he did with Elizabeth Ahn, Harris Tanveer, and Steven Yun, the

other potential defendants in this case.  (Appendix 61 at 170-171, 179-180).

Agent Shores testified that he had Steven Yun prepare a written statement after

he made a criminal admission. Agent Shores conceded that he did not have Mr. Hipps

prepare a written statement. (Appendix 61 at 180).

Agent Shores confirmed that the certificate of conformance for the threaded

rods was signed by Deborah Raney, not Mr. Hipps. (Appendix 61 at 184).

Agent Thomas DiVita testified that he was with Agent Shores during the third

interview of Mr. Hipps on November 2, 2016. Agent DiVita stated that he asked a

couple of questions but his primary role was to observe and take notes. (Appendix 63

at 8-9). Agent DiVita confirmed that, during the interview, Mr. Hipps indicated that

he had told Steven Yun that the threaded rods CBOL was providing to STAT had to

be manufactured in the United States. (Appendix 63 at 12).

Agent DiVita testified that Hipps gasped, dropped his head, and stated, "Oh

wow," when Agent Shores showed him the file folder that had been obtained from

STAT. Hipps confirmed that he recognized the file folder.  (Appendix 63 at 12-13).

Agent DiVita testified that, when Agent Shores showed Hipps the labels that

said "made in India," Hipps said he did not realize that the labels included that language. Agent DiVita testified that, when Agent Shores pressed Mr. Hipps on this issue, Hipps stated that Deborah Raney made him ship the items out. Hipps stated that he cut the labels off the threaded robs and put the labels in the file folder. Agent DiVita testified that Hipps said he removed the labels so the product would appear as if it came from the United States. (Appendix 63 at 14-15).

On cross-examination, Agent DiVita confirmed that he took notes regarding this third interview of Mr. Hipps that was conducted on November 2, 2016. However, his notes had not been turned over to the defense until the week before the trial in August 2019. (Appendix 63 at 17-18).

Agent DiVita confirmed that his notes reflected that Mr. Hipps advised the agents that he had told Mr. Yu at CBOL that STAT required products manufactured in the United States. He also confirmed that Hipps had denied seeing the mill certificate which indicated that the threaded rods were manufactured in India. Agent DaVita testified that the email containing the mill certificate as an attachment was not sent directly to one of Mr. Hipps' email addresses, but that Hipps was carbon copied on the email. (Appendix 63 at 22-25).

Agent DiVita also testified that his notes reflected that Mr. Hipps advised the agents that Deborah Raney had taken the paperwork out of the tubes and rods, and that

he did not see "made in India" on the labels. Agent DiVita stated that Mr. Hipps told them this initially, but later changed his statement. Agent DiVita conceded, however, that his notes did not reflect that Mr. Hipps actually admitted to seeing the "made in India" labels. (Appendix 63 at 25-28).

Agent DiVita confirmed that his notes reflected that Hipps advised them that Deborah Raney had provided Hipps with the certificate of conformance to mail out with the threaded rods. Hipps also advised them that Raney had put some items in the file folder. Finally, DiVita's notes confirmed that Hipps indicated that he was following Raney's instructions and did not know what he was doing was wrong. Agent DiVita testified that his notes did not reflect that Mr. Hipps ever stated that he knew what he was doing was wrong or that he ever confessed to a crime. (Appendix 63 at 28-30).

Agent DiVita acknowledged that he never advised Agent Shores that they should record the interview with Mr. Hipps or that they should have Hipps write a statement. (Appendix 63 at 31).

After the Government rested its case, Mr. Hipps moved for a judgment of acquittal. Mr. Hipps argued that the Government's evidence failed to establish that he had the necessary mens rea to commit the charged offenses. (Appendix 63 at 36-37).

The district court denied Mr. Hipps' motion. The district court noted, however,

that the Government's case was "relatively thin." (Appendix 63 at 38).

Mr. Hipps testified on his own behalf and also called his mother, Judith Hipps, as a witness.

Jonathan Hipps testified that, at the time of the trial, he was 34 years of age. He obtained a degree in mechanical and aerospace engineering from the University of Florida. He subsequently got a master's degree in engineering. He testified that he loves NASA and would never do anything to harm it. Mr. Hipps lived with his family until he was 20 years old. (Appendix 63 at 41-42, 66).

Mr. Hipps' work at STAT involved him looking over government specifications, and filling requests for quotes for parts that can be used by the military, the government, or aviation. When he started working at STAT, Mr. Hipps was making $10 an hour. By the time he left, he was making $12 an hour. While he was at STAT, he never supervised anyone, wrote any checks, or made decisions about any contracts. He was at the bottom of the STAT organization that was lead by its owner, Deborah Raney. (Appendix 63 at 43).

Mr. Hipps testified that Deobrah Raney has access to the three email accounts that were assigned to him at STAT. He confirmed that he was assigned to the two contracts STAT had with NASA. (Appendix 63 at 45-46).

At Deborah Raney's request, Mr. Hipps located CBOL as a manufacturer who

could supply the parts necessary to fulfill the NASA contracts. Mr. Hipps communicated with Steven Yun at CBOL. At one point, Yun asked him if CBOL could provide materials from China so that the orders could be filled more cheaply and more quickly. Mr. Hipps replied back to Yun by both email and by phone and specifically advised him that the materials had to originate in the United States. He advised Yun in this fashion because the contract between STAT and NASA required only domestic materials. Mr. Hipps testified that he never conspired with anyone to trick NASA and provide them with materials that were made outside the United States. (Appendix 63 at 47-48).

Mr. Hipps testified that he was assigned to work on the threaded rods contract by Deborah Raney. During that period of time, the work environment at STAT was very stressful because people were rushed to fulfill orders, get quotes out, and meet requirements. Mr. Hipps stated that Deobrah Raney was not an easy person to work with. She yelled at Mr. Hipps because she was upset that they were falling behind on the NASA contract. During his testimony, Mr. Hipps paused and asked the trial judge for permission to swear. When given permission, Mr. Hipps stated that Raney told him to "get your fucking ass moving." (Appendix 63 at 48-49).

When the threaded rods from CBOL arrived at STAT, Deobrah Raney was "getting down on" Mr. Hipps throat, and pressuring him to get them sent out to

12

NASA. Raney instructed Hipps to remove the labels and packing slips that were on the package, to get everything organized, and to arrange for shipment of the threaded rods to NASA. (Appendix 63 at 49-50).

Mr. Hipps testified that, before the threaded rods arrived, he was carbon copied on an email from Steven Yun indicating that STAT should be receiving the rods shortly. Hipps recalled that the email had attachments, but stated that he did not read them all because he was rushing to get other tasks completed. He noted the fact that the threaded rods would be arriving soon and saw that there were invoices attached. (Appendix 63 at 50-51).

Mr. Hipps testified that he trusted Steven Yun and had no reason to believe that Yun was going to disregard the instructions he previously provided about the threaded rods. Hipps acknowledged that he removed labels from the threaded rods, but stated that he did not look at them closely. He also testified that he did not look at the foreign mill certificate because Deborah Raney was rushing him to get the shipment out to NASA. (Appendix 63 at 51-52).

Mr. Hipps confirmed that he was familiar with the green file folders that had been introduced as evidence at the trial. At Deborah Raney's request, he put the paperwork that came with the threaded rods into a green folder in order to keep a timeline of everything that occurred on that contract. (Appendix 63 at 52).

13

Mr. Hipps testified that he did not remove the labels off the threaded rods in order to make it appear they had been made in the United States. At the time he removed the labels, he believed the threaded rods had been made in the United States because he had specifically instructed Steven Yun to provide only domestic products to STAT. (Appendix 63 at 53).

Mr. Hipps testified that Deborah Raney signed the certificate of conformance. After Hipps prepared to ship the threaded rods to NASA, Raney gave him the certificate of conformance with her signature on it and instructed him to put it in the package. She never told him to make it look like the threaded rods came from the United States or advised him to "pull a fast one on NASA." Had she done so, Mr. Hipps testified that he would not have allowed it. He would not have allowed NASA to get materials made outside the United States. (Appendix 63 at 53-54).

In September 2014, Deborah Raney terminated Mr. Hipps' employment at STAT. She advised him that he had screwed up on a thickness for a tubing for NASA. After the day he was fired, Mr. Hipps never returned to NASA or spoke to Deborah Raney. (Appendix 63 at 54-55).

Mr. Hipps testified that he recalled speaking to Agent Shores for the first time by telephone in April 2015. He voluntarily spoke to Agent Shores without any reluctance or concerns and provided him with general information about his work at

14

STAT. (Appendix 63 at 55-56).

Mr. Hipps heard back from Agent Shores again in May 2015. Mr. Hipps voluntarily met Agent Shores at the Broward College Library. Agent Shores wanted to get a general timeline of events that took place with the order for both NASA contracts. (Appendix 63 at 56-57).

Mr. Hipps voluntarily spoke with Agent Shores for a third time in November 2016 at the Broward College Library. Mr. Hipps' mother, Judith Hipps, accompanied him to this meeting because they became concerned as to why he was being contacted a third time. His mother planned to sit off to the side and only intervene in the interview if he signaled her by nodding his head. (Appendix 63 at 58-59).

When Mr. Hipps arrived at the library, Agent Shores was accompanied by Agent DiVita. Agent Shores advised Mr. Hipps that he wanted to review new evidence with him. Agent Shores showed Mr. Hipps emails and documents. Although the agents started the interview in a friendly manner, that changed when Agent Shores pulled out a green folder from STAT. (Appendix 63 at 59-61).

Mr. Hipps testified that he had a strong verbal reaction to seeing the folder because he had not seen it in such a long time. He did not react to the folder in that fashion because he was guilty of any crime. (Appendix 63 at 60-61).

The agents showed Mr. Hipps the labels he had removed from the packages and

advised him that they were made in India. Mr. Hipps stated that this was the first time he saw that the labels said "made in India." When he advised Agent Shores of that fact, Agent Shores pointed to the extremely small print on the labels that indicated the origin of the threaded roads. (Appendix 63 at 61-62).

Mr. Hipps was shocked by this revelation as he was under the complete impression that there was no issue with the threaded rods. He was rushed to get the shipment out and never saw this information. (Appendix 63 at 62).

Despite Agent Shores aggressively confronting him, Mr. Hipps never told Agent Shores that he knew what he was doing was wrong. Mr. Hipps testified that, at the time he was working on the threaded rod project, he never believed that the rods were manufactured outside the United States. (Appendix 63 at 63-64).

Judith Hipps testified that Jonathan Hipps was her son. When he was about 3 years old, Ms. Hipps noticed that her son did not communicate. He was introverted, did not use a lot of words, and did not like to be around other people or kids. As Jonathan got older, he did well in math and science, but struggled with communication and socialization and did not have a lot of friends. Jonathan did not do well under pressure. (Appendix 63 at 79-80).

Ms. Hipps noticed that Jonathan was not like other children and started to home school him. Jonathan did well with home school but continued to struggle with group

16

activities. (Appendix 63 at 80-81).

Ms. Hipps testified that Jonathan Hipps is on the autism spectrum. When she found this out, it confirmed what she had already observed about her son.  (Appendix 63 at 81).

Ms. Hipps testified that Jonathan attended college from the age of 17 through the age of 22. He lived at home until he got his associate's degree and then attended the University of Florida, where he lived with his grandparents and his sister. They always kept a family member around to make sure Jonathan was okay. (Appendix 63 at 82).

Ms. Hipps testified that NASA had been very important to Jonathan since he was a little boy. Jonathan was very excited when he heard he would get to talk to NASA engineers as part of his job at STAT. (Appendix 63 at 82-83).

Ms. Hipps testified that she was worried when Jonathan was contacted by Agent Shores a third time. She decided to attend the meeting in the background. She intervened in the meeting when she noticed that her son's demeanor had changed. She testified that he exhibited "shock, terror, and disbelief" after Agent Shores advised him that he needed to speak with a lawyer. (Appendix 63 at 84-86).

After witness testimony and closing arguments of the parties, the jury found Mr. Hipps guilty as charged on all three counts of the Indictment. (Appendix 65 at 4). The

district court permitted Mr. Hipps to remain out of custody pending his sentencing hearing. (Appendix 65 at 5).

Mr. Hipps presented various character witnesses at his sentencing hearing to testify about his positive history and characteristics as a person. Mr. Hipps addressed the district court directly, and thanked his friends and family for providing him with strong support throughout the proceedings in this case. (Appendix 82).

After hearing the arguments for leniency made by Mr. Hipps' attorneys, the district judge inquired of the prosecutor in this case. The district judge stated the following:

> Mr. Boggs, I'd like you to comment on Ms. Raney, where she is, why she's not here, why she hasn't been charged, and why the Government charged Mr Hipps instead. I don't think you need to address much more than that.

(Appendix 82 at 24).

When imposing sentence, the district court stated the following:

> Well, I don't really know where to begin. So let me kind of begin with the end. And that is to say that I have had both of these lawyers appear before me numerous times, and I have great respect for both of them.
>
> I respect immensely the Office of the United States Attorney. They do good work. They do honest work, and they generally try to do the right thing. In this case, I think they did the wrong thing. I don't think it was a matter of bad motive. I think it was a matter of bad judgment, just like Mr. Hipps, with his disability, exercised a case of bad

18

judgment.

Our collective job here as members of the judiciary is to dispense justice. It's an important job. Indeed, it's critical to the maintenance of a civil society. This was recognized long ago by Aristotle as one of the cardinal virtues of humanity.

We in the third branch try hard to get it right, and I believe we usually do. But sometimes we fail. In this case, I think we have.

It's very hard to juxtapose Mr. Hipps with Ms. Raney and justify the outcome of this case. We have a practice in this Court after a jury trial of personally going back to the jury room and thanking jurors. And in this case, when I went back there, every juror was crying, every one of them. And they, too, wanted to know what happened to Ms. Raney.

I can't change the result of the jury's verdict. But I can, in some small measure, hope to correct this injustice in the form of my sentence. I wish I could do more. But, I too, have taken an oath, and my oath of office requires me to impose a sentence upon a conviction by the jury in this case.

So having considered the matter with great sadness, it is the judgment of the Court the defendant, Jonathan Charles Hipps, is placed on probation for a term of one year. His term consists of one year of probation on each of the Counts, I, II, and III, such terms to be run concurrently.

. . .

After considering the advisory sentencing guidelines in this case, as well as all the sentencing factors under 18, United States Code, Section 3553(a), I find that the sentence is imposed is unjust, but nevertheless required by my oath of

19

office.

I'm not proud today to be a federal district judge.

(Appendix 82 at 26-28).

Mr. Hipps subsequently filed a Motion for New Trial. In that motion, he argued that Agent Shores presented false testimony to the grand jury and the during the trial. Mr. Hipps also argued that the Government failed to disclose the notes Agent DiVita took during Mr. Hipps' third interview until one day before trial. (Appendix 68).

The Government filed a written response to Mr. Hipps' Motion for New Trial. (Appendix 71). The Government attached a transcript of Agent Shores' grand jury testimony to its response. (Appendix 71-1). At the conclusion of Agent Shores' testimony, members of the grand jury asked questions expressing skepticism as to why Mr. Hipps should be held responsible for something he was ordered to do by Deborah Raney and for which he received no benefit. (Appendix 71-1 at 19-32).

The district court entered an Order denying Mr. Hipps' Motion for New Trial. (Appendix 73). This appeal ensued.

20

## SUMMARY OF THE ARGUMENT

Throughout the trial in this case, the Government infected it with improper questions, statements, evidence, and arguments. The Government's actions improperly (1) shifted the burden of proof to the Defendant; (2) commented on the Defendant exercising his right to remain silent; (3) offered testimony of a law enforcement officer regarding his personal opinion of the Defendant's credibility; and (4) presented evidence regarding uncharged criminal acts. The district court committed plain error by permitting the Government's conduct because this was a case with flimsy evidence against the Defendant. There is at least a reasonable probability that the Government's improper conduct persuaded the jury to find the Defendant guilty.

## **ARGUMENT**

## **THE DISTRICT COURT COMMITTED PLAIN ERROR BY PERMITTING THE GOVERNMENT TO REPEATEDLY INTRODUCE IMPROPER EVIDENCE, ASK IMPROPER QUESTIONS, AND MAKE IMPROPER ARGUMENT**.

The district court committed plain error because it permitted the Government to (1) shift the burden of proof to the Defendant; (2) comment on the Defendant exercising his right to remain silent; (3) offer testimony of a law enforcement officer regarding his personal opinion of the Defendant's credibility; and (4) present evidence regarding uncharged criminal acts. This Court should reverse the Defendant's conviction because this was a close case and the Government's improper conduct affected the Defendant's substantial rights and the fairness of the proceedings.

## 1.    **The Prosecutor Asked Questions and Made Arguments Which Impermissibly Shifted the Burden of Proof to the Defendant.**

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." Additionally, the Supreme Court has held that a defendant does not have to disprove anything nor prove innocence . . ." *United States v. Simon*, 964 F.2d 1082, 1086 (11th Cir. 1992).

> This Court, recognizing the government's burden and obligation of providing guilty beyond a reasonable doubt, has recognized that a prosecutor's comment may be so prejudicial as to shift the burden of proof. Such

22

prosecutorial misconduct, if "so pronounced and persistent that it permeates the entire atmosphere of the trial," requires reversal. Prosecutors must observe the distinction between the permissible practice of arguing evidence and suggesting inferences which the jury might draw from it and the impermissible practice of arguing suggestions beyond the evidence. **Additionally, prosecutors must refrain from making burden-shifting arguments which suggest that the defendant has an obligation to produce any evidence or to prove innocence**.

*Id*. (internal citations omitted) (emphasis added).

Here, the prosecutor's questions and arguments repeatedly shifted the burden of proof to the Defendant. First, during the Government's opening statement, the prosecutor stated the following:

> Agents interviewed the defendant three different times, and you're going to hear testimony about that. The first two times, agents didn't know about the threaded rod. They were actually investigating a different part of the order with something that – didn't necessarily have to do with any wrongdoing by the defendant.

> But during those two interviews, they asked the defendant, "Hey, is there anything else that you know about that – parts that don't comply that were provided by STAT?" And the defendant said no. **And the evidence will show that the defendant didn't tell them about this issue with the threaded rods until the third interview**, and even – you'll hear that in the third interview, he didn't tell them – what happened until the agents pulled out the e-mails that showed that these rods came from India.

(Appendix 61 at 101-102) (emphasis added)

23

The highlighted statement made by the prosecutor suggested to the jury that the Defendant had an obligation to produce evidence and to prove his innocence when questioned by police. As a result, this statement impermissibly shifted the burden to the Defendant.

Next, the prosecutor asked numerous questions during the trial which shifted the burden of proof to the Defendant. The first exchange was between the prosecutor and Agent Shores and addressed Shores' first interview of Mr. Hipps. It  included the following:

> Q.    During this conversation, did you ask Mr. Hipps about, sort of – any general questions about if he knew about other parts that were an issue?
>
> A.    Yeah. As part of our initial fact-finding and my initial communications with Mr. Hipps, I asked if he was aware of any other materials or shipments from STAT industry to NASA that contained substandard parts or equipment, and he responded no, he was not aware of any.

(Appendix 61 at 138).

The next exchange addressed Agent Shores' second interview of Mr. Hipps and included the following:

> Q.    And during this second interview, did the defendant say anything about the shipment of threaded rods?
>
> A.    No. During the second interview, Mr. Hipps did not say anything about the threaded rods.

24

(Appendix 61 at 142).

The prosecutor's question and Agent Shores' answers about the first and second interviews improperly focused on the fact that the Defendant did not volunteer information about other materials STAT was shipping to NASA. Again, the exchange improperly advised the jury that the Defendant had a burden to volunteer information and prove his own innocence.

Finally, the following exchange addressed whether the Defendant ever disputed whether he had sent any particular email. The exchange was as follows:

> Q.    At any point did you show the defendant an e-mail and the defendant told you that was not him that sent it out?
>
> A.    No, he never made any statements to the effect of "That's not my email. I did not send that or receive that email."

(Appendix 61 at 205).

The Defendant's objection to this exchange based on burden shifting was overruled by the district court. (Appendix 61 at 205). The exchange between the prosecutor and Agent Shores improperly advised the jury that the Defendant had some burden of proof to dispute the Government's evidence in this case. Instead, if the Government was relying on emails to support its case, it was the Government's burden to prove to the jury that the Defendant was the individual who sent or received

the emails in question.

## 2.    The Prosecutor Repeatedly Commented on the Defendant Exercising His Right to Remain Silent.

Each of the aforementioned statements of the prosecutor and the exchanges between the prosecutor and Agent Shores also constituted an improper comment on the Defendant exercising his right to remain silent. The prosecutor's conduct highlighted various instances in which the Defendant chose not to say anything about a particular topic when questioned by law enforcement. (Appendix 61 at 101-102, 138, 142, 205).

It is beyond dispute that, pursuant to the Fifth Amendment to the United States Constitution, an individual always maintains the right to remain silent when confronted by law enforcement. The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "The privilege permits a person to refuse to answer questions, in formal or informal proceedings, where the answers might be used to incriminate him in future criminal proceedings." *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984).

There is currently a split between the circuit courts on whether the government may use a defendant's pre-arrest silence as substantive evidence of guilt. The First, Second, Sixth, and Seventh Circuits all prohibit the use of pre-arrest silence as substantive evidence of guilt. *See United States v. Wilchcombe*, 838 F.3d 1179, 1190

(11th Cir. 2016). This Court reached the opposite conclusion in *United States v. Rivera*, 944 F.2d 1563 (11th Cir. 1991). However, this Court has also acknowledged that *Rivera* may have been wrongly decided. *See United States v. Alexander*, 713 Fed. Appx. 919, 926 (11th Cir. 2017) (describing *Rivera* decision as "troubling"); *United States v. Campbell*, 223 F.3d 1286, 1290 (11th Cir. 2000) (noting the confusion surrounding the *Rivera* decision).

The Defendant asserts that the plain language of the Fifth Amendment and the United States Supreme Court's decision in *Murphy* establishes that *Rivera* was wrongly decided. Thus, in this case, the Government was improperly permitted to introduce evidence of the Defendant exercising his right to remain silent and to argue that his decision to do so constituted substantive evidence of guilt.

**3.    The Prosecutor Improperly Elicited Testimony from Agent Shores Regarding His Personal Opinion of the Defendant's Credibility.**

The Government was improperly permitted to introduce testimony from Agent Shores reflecting his personal opinion that the Defendant was not being truthful with him. It is well-established that the credibility of a witness is solely within the province of the jury. Thus, another witness is prohibited from testifying as to his personal opinion of a witness' veracity. *See e.g. United States v. Schmitz*, 634 F.3d 1247, 1269 (11th Cir. 2011); *United States v. Belt*, 2509 Fed. Appx. 957, 969 (11th Cir. 2007).

It is especially harmful for a law enforcement witness to give his opinion of a

witnesses' credibility because of the great weight jurors generally afford that testimony. *See United States v. New*, 491 F.3d 369, 378 (8th Cir. 2007); *Seibert v. Florida*, 923 So. 2d 460, 472 (Fla. 2006).

Here, Agent Shores was permitted to testify as follows:

> Q.    Okay, so what happened after this?
>
> A.    This raised more questions for – for our investigation as to – in addition to the stainless steel tubes, we now have concern about the threaded rod. **I also had concerns as to whether Mr. Hipps had been honest with me during the first two interviews.**

(Appendix 61 at 150) (emphasis added).

Over the Defendant's objection, Agent Shores was also permitted to testify as follows:

> Q.    So did you confront – did you confront the defendant about – about all this?
>
> A.    Yes, I did. I told him I no longer believed what he was telling me.

(Appendix 61 at 168).

Agent Shores subsequently provided similar testimony.

> Q.    Did you at any point after that – after the discussion, did you then at that point threaten to put him away for a long time or anything in that vein?
>
> A.    No. I made no threats to Mr. Hipps. After he made his admissions, he talked extensively and in detail

about the next steps. We talked about him wanting to cooperate with us. We wanted and asked for his help in going after Deborah Raney, and **I advised that further lies or if what he was telling me wasn't true, that there would be consequences. There could be consequences for that, for lying to federal agents**.

(Appendix 63 at 91) (emphasis added).

There was no legal basis for repeatedly permitting the Government to elicit testimony from Agent Shore which was unresponsive to the questions he was asked and which indicated his opinion that the Defendant had lied to him. The well-established caselaw on this issue firmly establishes that this testimony was improper, infringed on the province of the jury, and was extremely prejudicial to the Defendant.

**4.      The Government Improperly Introduced Evidence of Uncharged Criminal Acts.**

The Government was also improperly permitted to repeatedly introduce evidence concerning other uncharged criminal acts allegedly committed by STAT. The Government offered evidence about its investigation into stainless steel tubes STAT was providing to NASA despite the fact that the tubes may have originated in China. This transaction was separate from the transaction between STAT and NASA involving threaded rods that provided the factual basis for offenses charged against the Defendant. Since the Defendant was involved with the transactions between STAT and NASA in his role as an employee of STAT, the introduction of this evidence

improperly suggested to the jury that he had a propensity to commit the offenses for which he was charged**.**

Evidence of uncharged crimes is inadmissible unless it is relevant to some issue other than the defendant's character and its probative value is not substantially outweighed by its undue prejudice. *See United States v. Lail*, 846 F.2d 1299, 1300 (11th Cir. 1988); Fed. R. Evid. 404(b). Rule 404(b)(1) specifically states that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."

Here, the Government repeatedly introduced evidence about a separate incident in which it believed that STAT was violating the law by providing NASA with materials made in China instead of the United States. First, the Government introduced the following testimony of Agent Shores:

> Q.    And did your initial investigation focus on this – this item of threaded rod that we are discussing today?
>
> A.    No. At the beginning of the – excuse me. In the beginning of this investigation, we were focused on another line item or set of line items in the contract. It was tubes – stainless steel tubes. A quality assurance employee at NASA had discovered what he believed to be a suspicious document possibly indicating that the tubes originated in China. That was our focus in the beginning.

30

(Appendix 61 at 136).

Next, the Government introduced testimony regarding Agent Shores' second interview of the Defendant. That testimony was as follows:

> Q.   At this point when you did this interview, did you know anything about the threaded rod?
>
> A.   No. Again, one month after our initial contact with Mr. Hipps, we still were focusing on the stainless steel tubes.
>
> . . .
>
> Q.   Okay, what did you ask him about after that?
>
> A.   We continued discussing the circumstances surrounding the incidents with the NASA contracts, particularly the stainless steel tubes.

(Appendix 61 at 141).

Finally, Agent Shores was permitted to testify as follows:

> Q.   Okay, so what happened after this?
>
> A.   This raised more questions for – for our investigation as to – in addition to the stainless steel tubes, we now have concern about the threaded rod. I also had concerns as to whether Mr. Hipps had been honest with me during the first two interviews.

(Appendix 61 at 150).

None of Agent Shores' testimony regarding his investigation into the stainless steel tubes he believed may have originated in China was relevant to the offense for

31

which the Defendant was on trial. More importantly, any minimal relevance was substantially outweighed by the danger of unfair prejudice to the Defendant. The evidence improperly suggested to the jury that he had a propensity to commit this type of offense in his role as an employee at STAT. Although the Government subsequently introduced testimony that it did not believe that the Defendant was involved in any wrongdoing with regard to the stainless steel tubes (Appendix 61 at 150), that testimony was insufficient to un-ring the bell and remove the taint that had been placed on the Defendant's character in the eyes of the jury.

**5.**    **The Defendant's Conviction Should Be Reversed**

Where trial counsel does not object to the errors in question, this Court reviews the impact of the prosecutor's improper conduct on the fairness of the trial under the plain error standard of review. *Schmitz*, 634 F.3d at 1268. Under this standard, a defendant must show the following: (1) an error occurred; (2) the error was plain; (3) the error affected the defendant's substantial rights; and (4) the error seriously affected the fairness of the judicial proceedings. *Id*.

"A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would be different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *United States v. Foster*, 760 Fed. Appx 693, 699 (11th Cir. 2019) (internal

citations omitted). A conviction is subject to reversal if the errors in question are plain under the controlling caselaw. *Id*. at 1270-71.

Here, the aforementioned caselaw from this Court plainly establishes that the Government was improperly permitted to shift the burden of proof to the Defendant, comment on the Defendant exercising his right to remain silent, introduce another witness's opinion about the credibility of the Defendant, and introduce evidence of uncharged crimes which impugned the character of the Defendant. The Defendant's substantial rights and the fundamental fairness of the proceedings were affected by the Government's conduct.

This was a very close case in which the jury may have been walking the line between a verdict of guilty and not guilty, and the Government was permitted to push the jury to the side of guilt with improper conduct. The evidence regarding the Defendant's knowledge that the items in question were not made in the United States was flimsy. The Government's main piece of evidence was the Defendant's purported admission that he had the required knowledge. However, unlike the material statements of all the other material witnesses and suspects in this case, that purported admission was not recorded or transcribed by the law enforcement agents in this case. The failure to record the Defendant's interviews was inconsistent with the normal practice of the NASA Office of the Inspector General which Agent Shores was

employed with at the time of this investigation. (Appendix 61 at 162-163, 170-172). Other evidence in this case, including the Defendant's own testimony and email correspondence, indicates that the Defendant took substantial efforts to ensure that the items in question were produced in the United States, and did not have knowledge they had originated in India.

Under these circumstances, each of the errors address in subsections (A) - (D) of this argument constitute plain error requiring reversal of the Defendant's conviction. In the event this Court does not believe that any of the errors support reversal on their own, the cumulative effect of the errors deprived the Defendant of a fair trial and require reversal. "Even where individual judicial errors or prosecutorial misconduct may not be sufficient to warrant reversal alone, we may consider the cumulative effects of the errors to determine if the defendant has been denied a fair trial." *United States v. Lopez*, 590 F.3d 1238, 1258 (11th Cir. 2009).

There is at least a reasonable probability that the outcome of the Defendant's trial would have been different in absence of the prosecutor's misconduct. Since that misconduct permeated the entire trial, this Court should reverse the Defendant's conviction and remand this case for a new trial.

## **CONCLUSION**

For the aforementioned reasons, this Court should reverse the Defendant's convictions and remand the case to the district court for a new trial.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of this Initial Brief has been provided by e-service and mail delivery to Assistant United States Attorney Todd Grandy, Todd.Grandy@usdoj.gov, on this 21st day of October, 2020.

/s/ William R. Ponall
WILLIAM R. PONALL
PONALL LAW
SunTrust Building
253 North Orlando Avenue, Suite 201
Maitland, Florida 32751
Florida Bar No. 421634
Telephone: (407) 622-1144
bponall@PonallLaw.com

Attorney for Appellant

## <u>CERTIFICATE OF COMPLIANCE</u>

The Appellant's Initial Brief complies with the type-volume limitations of Fed. R. App. P. 32(a) because it contains less than 14,000 words.

The Appellant's Initial Brief also complies with the typeface and type style requirements of Fed. R. App. P. 32(a) because it has been prepared in proportionately spaced typeface using WordPerfect 11 in Times New Roman 14.

/s/ William R. Ponall
WILLIAM R. PONALL
PONALL LAW
SunTrust Building
253 North Orlando Avenue, Suite 201
Maitland, Florida 32751
Florida Bar No. 421634
Telephone: (407) 622-1144
bponall@PonallLaw.com

Attorney for Appellant