[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-15155
Non-Argument Calendar
_____

D.C. Docket No. 6:19-cr-00012-GAP-GJK-1

UNITED STATES OF AMERICA,

                                                     Plaintiff - Appellee,

versus

JONATHAN CHARLES HIPPS,

                                                     Defendant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(May 21, 2021)

Before MARTIN, JORDAN, and GRANT, Circuit Judges.

PER CURIAM:

      Jonathan Hipps appeals his convictions related to misrepresentations to the

National Aeronautics and Space Administration ("NASA"). After careful consideration, we conclude the district court committed plain error when it allowed a government witness to testify about (and discount) Hipps's credibility. We therefore vacate Hipps's convictions.

I

From April 2013 through September 2014, Hipps worked as a technical specialist for STAT Industry, Inc. ("STAT"), a company that described itself as "serving the Aviation industry." Acting as a middleman, STAT placed bids for government contracts and hired people to fulfill those contracts. In 2014, NASA awarded a contract to STAT to supply various materials, including stainless steel threaded rods. The contract required that STAT comply with the Buy American Act and provide materials manufactured in the United States.

During this time, Hipps was 29 years old and a low-level employee at STAT, earning $10 an hour when he started, advancing to $12 an hour by the time he left. Hipps has a bachelor's and a master's degree in engineering, but had no prior experience working in government contracting. During his time at STAT, Hipps did not have any supervisory responsibilities.

Deborah Raney, the president of STAT, assigned Hipps the NASA contract to procure stainless steel threaded rods and other materials. To fulfill the contract, Hipps contacted CBOL, a company located in California. Hipps testified that he

2

told CBOL the parts had to be made domestically and that he turned down CBOL's offer to obtain threaded rods at a cheaper price from a foreign source.

When the threaded rods arrived, Raney inspected the rods, instructed Hipps to remove the labels attached to them, took the paperwork into another room, and told Hipps to get the rods shipped to NASA. Raney signed the certificate of conformance, certifying to NASA that the threaded rods met the contract requirements. Hipps testified that he did not know the threaded rods were not in fact manufactured domestically. By 2018, STAT was no longer in business.

In 2019, Hipps was criminally charged with (1) committing mail fraud, in violation of 18 U.S.C. § 1341 and 2; (2) concealing of a material fact, in violation of 18 U.S.C. § 1001(a)(1) and 2; and (3) making a false statement, in violation of 18 U.S.C. § 1001(a)(3) and 2. In substance, Hipps was accused of knowingly providing stainless steel threaded rods to NASA that were not manufactured in the United States.

Over the course of a two-day trial, a jury heard evidence of Hipps's alleged scheme. As relevant to this appeal, the government presented testimony of two investigators from the NASA Office of the Inspector General at the Kennedy Space Center. During the investigation, Agent Shores interviewed Hipps on three occasions, then testified to the substance of each interview at trial.

Agent Shores first interviewed Hipps in April 2015, mostly about problems

with a different shipment of steel tubes after NASA became concerned by STAT's tardiness in delivering contracted items and indications that the tubes were foreign made. According to Agent Shores, Hipps said he communicated with CBOL to fulfill STAT's contract with NASA and told CBOL all products had to be manufactured domestically. Hipps denied being aware of any shipments from STAT to NASA that contained substandard parts.

Agent Shores interviewed Hipps again about a month later, in May 2015. At this second interview, Hipps provided the company email addresses assigned to him while he worked at STAT. According to Agent Shores, Hipps said again that he told CBOL any materials provided had to be of domestic origin.

Following this second interview, Agent Shores obtained emails associated with Hipps's company email addresses, as well as the STAT file folders related to the contract with NASA for the threaded rods. Agent Shores also obtained the labels that were removed from the threaded rods, which indicated the rods were manufactured in India. At this point, Agent Shores's investigation shifted to focus on Hipps's potential criminal culpability.

In November 2016, Agent Shores had a third interview with Hipps, this time with Agent DiVita, another NASA investigator, present. At this interview, Agent Shores showed Hipps the STAT file folders he now had. According to Agent Shores, Hipps gasped audibly when presented with the file folders. Agent Shores

also said that Hipps denied ever seeing any of the documents in the file folders and denied having seen the words "made in India" on the labels for the threaded rods. Agent Shores testified that, although his normal practice was to record interviews when investigating potential criminal liability, the interview with Hipps was not audio recorded because he had made "a mistake" and did not bring a recorder with him.

Agent Shores's testimony about his interviews with Hipps included three instances in which he commented on Hipps's credibility. First, on direct examination, the government asked Agent Shores about his review of Hipps's email with CBOL. In the email at issue, Hipps declined CBOL's offer to obtain threaded rods at a reduced price from a foreign source, and wrote, "Our quote must be domestic material only. This means no raw materials outside the U.S.A. Thank you for your consideration, though." After Agent Shores described the email, the government had the following exchange with Shores:

> Q. Okay. So what happened after this?
>
> A. This raised more questions for – for our investigation as to – in addition to the stainless steel tubes, we now had concern about the threaded rod. I also had concerns as to whether or not Mr. Hipps had been honest with me during the first two interviews.

The second instance came after Agent Shores testified that Hipps denied having seen documents indicating that the threaded rods were foreign made. The

5

government then had the following exchange with Agent Shores:

> Q. At this point had you shown him anything that was in the file folders or told him about anything that was in the file folders?
>
> A. No, no.
>
> Q. Okay.
>
> A. At this point, after I had advised him of – you know, that we had seized these, I began showing him documents in the file folders . . . . Mr. Hipps responded repeatedly that he didn't recall seeing any of those documents. I challenged him on the truthfulness of that answer. He continued to say, "I don't know," or became unresponsive. At this point in the interview, I then showed him the yellow labels that had been torn off, and he told me in response, after looking at them, that he didn't recall seeing the wording on the labels. It was at this point I told Mr. Hipps I no longer believed anything that he was saying.

The third instance occurred during Agent Shores's rebuttal testimony. Agent Shores again testified about his recollection of the third interview with Hipps, describing it in the following manner:

> [Hipps] stated to me, "I don't think I saw the wording," or "I didn't see the wording." That is when, I guess, we would call it – I confronted him. I made an affirmative statement: "I don't believe you."

Agent DiVita also testified. According to Agent DiVita, during the third interview Hipps confessed to removing the labels from the threaded rods so that it would appear as if they were domestically manufactured. However, Agent DiVita conceded that his contemporaneous notes did not reflect that Hipps admitted to

6

seeing "made in India" written on the labels. His notes also state that Hipps "was following instructions" and "did not know it was wrong" to cut off the labels. Agent DiVita also failed to audio record this interview.

Hipps testified as well. Hipps said the first time he saw that the labels said "made in India" was during the third interview with Agent Shores and Agent DiVita, when Shores pointed to the small print on the labels indicating the origin of the threaded rods. The labels appear as follows:



Hipps testified he was "in shock" when he saw the labels at the third interview. He testified that he had not confessed at the third interview to purposefully hiding the foreign origin of the threaded rods. He testified that he

told the Agents he was unaware the threaded rods were not domestically made.

Hipps also explained why he never saw that the labels indicated the threaded rods were not domestically manufactured. Hipps testified that, during his employment at STAT, Raney was upset that the company was falling behind its deadlines for NASA contracts. He testified that he did not notice that the labels or associated documents indicating that the threaded rods were foreign made, because he was rushing to get the orders shipped:

> Q. Was Deborah Raney an easy person to work for?
>
> A. No.
>
> Q. Why do you say that?
>
> A. Because there were times when she would yell at me at times and – and cuss at me a lot.
>
> Q. Why? Why was she yelling at you? Why was she cussing at you?
>
> A. Because she was getting upset that the NASA solicitations . . . were falling behind the deadline that NASA had wanted them. NASA was calling Deborah Raney, asking when she was going to deliver those parts, and Deborah Raney was yelling at me to – to – I'm sorry. I'm sorry. Am I allowed to swear?
>
> THE COURT: You may.
>
> THE WITNESS: The words Deborah Raney used at the time were, I quote, "Get your fucking ass moving."

Hipps further testified that Raney

> was rushing me to get [the threaded rod shipment] out because it – everything for NASA was already late, and she rushed me to – to do the shipping. I asked Deborah Raney, "What do I need to do? What's the process for getting something for shipping to government?" because at the time anything being shipped to government was completely different compared to shipping domestic or even international. There's other paperwork that has to be included with it, which I had received no training at my time with STAT. When I asked Deborah Raney how do I fulfill this, how do I – what instructions, Deborah Raney quoted to me, "Figure it out yourself. I'm not you[r] fucking babysitter."

Hipps testified that Raney instructed him to "remove labels and packing slips that were on the package itself so that it was just – just the – the package alone without all of – all of the labels."

The jury also heard testimony from Hipps's mother, Judith Ann Hipps. She testified that her son was on the autism spectrum. She explained that, as a child, he "preferred to be on his own. . . . He was very gifted in math and sciences. He . . . devoured books, and he felt more comfortable there." Even while he worked toward his bachelor's degree, Hipps lived at home. Judith Hipps also testified, "Under pressure he would – oh he didn't – he didn't perform well under pressure at all. He would get – he'd close into himself." She testified that she had accompanied her son to the public library where the third interview was conducted, because she became worried when she heard he had been contacted by Shores for a

9

third time. She noted that, by the time of the third interview in 2016, her son had long stopped working for STAT. Though she could not hear the interview from her vantage point in the library, she watched the interview from afar and saw the agents "leaning in" and Hipps's "face fall." It was at this point that Judith Hipps approached the table where the interview was being conducted. The agents informed her that she needed legal counsel and left. She described her son as exhibiting "[t]error, shock, [and] disbelief" in that moment.

At the conclusion of the government's case, Hipps moved for a judgment of acquittal. In ruling on the motion, the district court recognized that the government's case rested on "circumstantial evidence," but ruled, "I have to look at . . . the evidence . . . in the light most favorable to the Government, and although I think the Government's case is relatively thin, when you add on to it the alleged confession, I think there's sufficient evidence to go to the jury."

The jury convicted Hipps on all three counts. At sentencing, the district court asked why Raney, the owner of STAT who signed the certification for the threaded rods, had not been charged. The government explained it lacked admissible evidence to do so.

In imposing Hipps's sentence, the district court stated the following:

> Well, I don't really know where to begin. So let me kind of begin with the end. And that is to say that I have had both of these lawyers appear before me numerous times, and I have great respect for both of them.

10

I respect immensely the Office of the United States Attorney. They do good work. They do honest work, and they generally try to do the right thing. In this case, I think they did the wrong thing. I don't think it was a matter of bad motive. I think it was a matter of bad judgment, just like Mr. Hipps, with his disability, exercised a case of bad judgment.

Our collective job here as members of the judiciary is to dispense justice. It's an important job. Indeed, it's critical to the maintenance of a civil society. This was recognized long ago by Aristotle as one of the cardinal virtues of humanity.

We in the third branch try hard to get it right, and I believe we usually do. But sometimes we fail. In this case, I think we have.

It's very hard to juxtapose Mr. Hipps with Ms. Raney and justify the outcome of this case. We have a practice in this Court after a jury trial of personally going back to the jury room and thanking jurors. And in this case, when I went back there, every juror was crying, every one of them. And they, too, wanted to know what happened to Ms. Raney.

I can't change the result of the jury's verdict. But I can, in some small measure, hope to correct this injustice in the form of my sentence. I wish I could do more. But I, too, have taken an oath, and my oath of office requires me to impose a sentence upon a conviction by the jury in this case.

So having considered the matter with great sadness, it is the judgment of the Court the defendant, Jonathan Charles Hipps, is placed on probation for a term of one year. His term consists of one year of probation on each of the Counts, I, II, and III, such terms to be run concurrently. . . .

> After considering the advisory sentencing guidelines in this case, as well as all the sentencing factors under 18, United States Code, Section 3553(a), I find that the sentence imposed is unjust, but nevertheless required by my oath of office.
>
> I'm not proud today to be a federal district judge.

In July 2020, seven months into his sentence of one year's probation, Hipps moved for early termination. He cited the adverse impact being on probation had on his ability to obtain gainful employment and the "devastating collateral consequences of a federal conviction," including "the permanent stigma" of having felony convictions. The government did not oppose the request. The district court terminated Hipps's probation in August 2020.

Hipps timely appealed his convictions. We now address Hipps's argument that the district court plainly erred in allowing Agent Shores to testify on his assessment of Hipps's credibility. Agent Shores repeatedly testified that he did not find Hipps to be credible. Although Hipps objected to one set of Agent Shores's testimony on credibility before the district court, he only argues plain error on appeal. We note litigants likely cannot dictate the standard of review on appeal, see, e.g., United Sates v. Neuci-Pena, 711 F.3d 191, 196 (1st Cir. 2013) (rejecting party's argument that de novo review applied to argument not raised in the district court); United States v. Vontsteen, 950 F.2d 1086, 1091 (5th Cir. 1992) (en banc) ("[N]o party has the power to control our standard of review"); Cordrey v. Euckert,

12

917 F.2d 1460, 1465 (6th Cir. 1990) (applying de novo review in a case where "neither party discussed the proper standard of review on appeal"). And Hipps may be entitled to abuse-of-discretion review as to the objected-to statement. But we proceed with the plain error standard set out by Hipps because his challenge succeeds either way.

## II

To establish plain error, a defendant must show that there was an error, that the error was plain, and that the error affected his substantial rights. United States v. Campbell, 223 F.3d 1286, 1288 (11th Cir. 2000) (per curiam). If he makes that showing, then we will correct the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. Id.

To be sufficiently "plain," the alleged error must be clear from the plain meaning of a statute or constitutional provision, or from a holding of the Supreme Court or this Court. United States v. Rodriguez, 627 F.3d 1372, 1381 (11th Cir. 2010). A defendant must satisfy the reviewing court's judgment, informed by the entire record, that but for the error "the probability of a different result is sufficient to undermine confidence in the outcome of the proceeding." United States v. Dominguez Benitez, 542 U.S. 74, 83, 124 S. Ct. 2333, 2340 (2004) (quotation marks omitted).

## III

We conclude the district court plainly erred in allowing Agent Shores to testify repeatedly about his perception of Hipps's truthfulness and credibility. Our precedent is clear that a witness may not testify as to the credibility of another witness in this manner. United States v. Henderson, 409 F.3d 1293, 1299 (11th Cir. 2005) (citing Fed. R. Evid. 608(a)). That is because Federal Rule of Evidence 608(a) "permits a witness to testify as to another witness's general character for truthfulness or untruthfulness," but not "about another witness's truthfulness on a particular occasion." United States v. Rivera, 780 F.3d 1084, 1096 (11th Cir. 2015).

Here, Agent Shores did exactly what our precedent prohibits: he testified about the credibility of Hipps, who was a witness in his own defense. Agent Shores stated multiple times that he did not believe Hipps to be truthful. And Agent Shores's statements that he did not believe Hipps had little relevance to other legitimate lines of testimony, such as explaining his investigative methods. For example, when relaying that during the third interview Hipps said he "didn't see the wording" on the label, Agent Shores added, "That is when, I guess, we would call it – I confronted him. I made an affirmative statement: 'I don't believe you.'" Agent Shores's commentary on Hipps's credibility was not responsive to the government's direct questions. For instance, after Agent Shores described

Hipps's email to CBOL declining to obtain non-domestic materials, the government asked, "what happened after this?" Agent Shores responded, "This raised more questions . . . . we now had concern[s] about the threaded rod. I also had concerns as to whether or not Mr. Hipps had been honest with me during the first two interviews." This record shows that such testimony does not help to explain the investigation or relay factual events; rather, it served to discredit Hipps. When the government asked Agent Shores whether he had "shown [Hipps] anything that was in the file folders," Shores gave an extended answer, ending with, "at this point I told Mr. Hipps I no longer believed anything he was saying." These statements about Hipps's truthfulness, tacked on at the end of Agent Shores's responses, served no purpose other than to undermine Hipps's credibility.

The district court overruled Hipps's objection to Agent Shores's testimony on his credibility. But under this Circuit's precedent, "the duty to make credibility determinations about a trial witness falls squarely in the province of the jury, and it is not appropriate for another witness . . . to tread on the jury's turf." Rivera, 780 F.3d at 1096. In permitting Agent Shores to repeatedly comment on Hipps's credibility, the district court plainly erred. See id.; Henderson, 409 F.3d at 1299 (a witness may not testify on another witness's credibility under the guise of explaining investigative steps "as an indirect way of bolstering . . . or attacking" the credibility of another witness); United States v. Schmitz, 634 F.3d 1247, 1269

15

(11th Cir. 2011) (a witness is prohibited from testifying as to his personal opinion of a witness's veracity).

Next, the plain error affected Hipps's substantial rights. Campbell, 223 F.3d at 1288. The government's case relied on circumstantial evidence and was, as the district court put it, "relatively thin." Agent Shores and Agent DiVita insisted that Hipps confessed to the crime during the third interview, even though DiVita's notes said instead that Hipps did not know he was doing anything wrong, and neither agent recorded the interview. Agent Shores's repeated statements that he did not believe Hipps possibly affected the jury's perception of Hipps's testimony. Given that the prosecution relied on circumstantial evidence and the credibility of witnesses was a central issue at trial, we cannot say that this error, in light of the entire record, did not raise the probability of a different verdict. Dominguez Benitez, 542 U.S. at 83, 124 S. Ct. at 2340. We thus conclude that "the probability of a different result is sufficient to undermine confidence in the outcome of the proceeding." Id. (quotation marks omitted).

The error also affected the fairness, integrity, and public reputation of the proceeding. See Campbell, 223 F.3d at 1288. The district court recounted a negative emotional reaction from the jury following its delivery of the verdict: "[E]very juror was crying, every one of them." The court, too, said that it "wish[ed] it] could do more" to "correct th[e] injustice" of the verdict, but was bound by its

oath of office to impose a sentence on Hipps. Because Hipps has shown plain error requiring vacatur of his convictions, we need not address his remaining arguments.

**CONVICTIONS VACATED AND REMANDED.**